UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

_____

|   |   |
|---|---|
| CONSTITUTION STATE SERVICES, LLC, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| DNA GALLLERY, LLC | ) |
| | ) |
| Defendant | ) |

)                                         Civil Action No.

)                                         08 cv 1005

_____)

**DEFENDANT'S ANSWER,**
**COUNTERCLAIM AND**
**CLAIM FOR TRIAL BY JURY**

The Defendant, DNA Gallery, LLC answers the Complaint of the Plaintiff,

Constitution State Services, LLC, paragraph by paragraph, as follows:

1.      Paragraph 1 of Plaintiff's Complaint is a statement of the jurisdiction of

this Court which Defendant is not required to answer.  Notwithstanding, Defendant states

that Plaintiff, or one or more of its predecessors in interest, has issued a policy of

insurance, and that the parties are citizens of different states and that the amount in

controversy between them exceeds $75,000 exclusive of interest and costs.

2.      Defendant, DNA Gallery, LLC ("DNA") is without knowledge or

information sufficient to form a belief as to the truth of the allegations of Paragraph 2 of

the Complaint, and therefore, denies same.

3.    DNA denies that it is a corporation but it admits that it is a Massachusetts Limited Liability Company duly organized by law having a principal place of business in Provincetown, Massachusetts.

4.    DNA denies that it regularly conducted business in the State of New York.

5.    DNA admits that Centennial Insurance Company issued a policy of insurance to DNA and Volume Gallery, Inc., Policy Number 208 30 0084, effective for 12 months from May 1, 2003 (the "Policy"), insuring certain fine art as defined in the Policy against loss or damage.  DNA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 5 of the Complaint, and therefore, denies same.

6.    DNA is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6 of the Complaint, and therefore, denies same.

7.    DNA is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7 of the Complaint, and therefore, denies same.

8.    DNA admits that on or about January 6, 2004, it made a claim under the Policy for the loss or damage to approximately 1,200 works of fine art in an amount exceeding the $2,000,000 limits of the Policy.

9.    DNA is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint, and therefore, denies same.

10.    DNA admits only that a partial copy of the Policy is attached to the Complaint.  DNA further states that the Valuation provisions of the Policy are as contained in the Policy and not otherwise.

11.    DNA admits that the Policy contains provisions for a court to appoint an umpire to value the loss under the Policy if the parties' respective appraisers are unable to reach an agreement.

12.    DNA admits that the Parties have been unable to agree on the value of the property or the amount of the loss, and that their respective appraisers have been unable to agree on the selection of an umpire under the Policy.  DNA denies all other allegations of Paragraph 12 of the Complaint.

13.    DNA admits the allegations of Paragraph 13 of the Complaint.


## FIRST DEFENSE

The Complaint fails to state a claim against Defendant upon which relief can be granted.


## COUNTERCLAIM

### Summary of Claim

For many years, DNA Gallery, Inc. ("DNA"), a dealer in fine art, rented or occupied certain premises (the "Premises") at the Boston Center for the Arts, Inc. in Boston (the "BCA").  DNA used the Premises for various purposes including the storage of hundreds of works of fine art that were under its care, custody or control.   In 2003, the BCA entered the Premises without permission or authority, and it removed the content of the Premises.  In the process, approximately 1,200 works of art were lost, damaged, or destroyed.  All of the works that were lost, damaged, or destroyed were insured for up to $2,000,000 by Centennial Insurance Company a predecessor in interest to the Plaintiff,

Constitution State Services, LLC ("CCS").  CSS has failed and refused to fully value

DNA's loss under the policy, and to pay DNA for said loss.

<u>Parties in Counterclaim and Jurisdiction</u>

1.      Defendant, Plaintiff in Counterclaim, DNA Gallery, LLC (hereinafter

referred to as "DNA") is a Massachusetts Limited Liability Company duly organized by

law having a principal place of business in Provincetown, Massachusetts.  At all times

material hereto, DNA has been a dealer in fine art.

2.      Plaintiff, Defendant in Counterclaim, Constitution State Services, LLC

(hereinafter referred to as "CSS") is a limited liability company duly organized under the

laws of the State of New York, having its principal place of business in the State of New

York.

3.      Jurisdiction is conferred on this Court based on Diversity of Citizenship in

that this is a controversy between citizens of different states and the matter in controversy

exceeds, exclusive of interest and costs, the sum of $75,000 as specified in 28 USC §

1332(a)(1).

<u>Fine Art Insurance Policy for $2,000,000 issued to DNA</u>

4.      On or about May 1, 2003, Centennial Insurance Company ("Centennial

Insurance"), an insurance company organized under the laws of the State of New York,

issued an Art, Antiques & Collectibles Dealers Insurance Policy (the "Policy") to DNA

and to Volume Gallery, Inc. (a related gallery) for a period of twelve months

commencing on May 1, 2003 at 12:01 A.M., insuring works of "fine art" as that term is

defined in the Policy.  DNA paid to Centennial Insurance, or its agents, servants or

employees, the full premium of $8,800.00 which was required under the Policy.  A copy of the Policy (Policy No. 208 30 00 84) is attached hereto as "Exhibit A" and is incorporated herein by reference.

5.     Upon information and belief and for purposes of this Counterclaim only, DNA alleges that on or about October 1, 2003, Centennial Insurance entered into various agreements with Travelers Indemnity Company ("Travelers"), whereby Centennial Insurance sold, assigned, transferred, and conveyed all of Centennial Insurance's rights, titles, and interest in various business including the Policy.

6.     As part of these agreements, Centennial also agreed to let a wholly owned subsidiary of Travelers, namely, CSS, take over the adjustment of the claim under the Policy that is the subject of this Action, including pursuing and defending any legal action connected with the Policy.  As used herein, the term, "CSS" includes CSS, Centennial Insurance, and Travelers, as well as their agents, servants, employees, attorneys, or predecessors and successors in interest.

7.     While the Policy was in full force and effect, DNA suffered a loss of or damage to "Covered Property" as that term is defined in the Policy.

<u>Count I</u>
(Breach of Contract)

8.     DNA duly notified CSS of the loss of or damage to the Covered Property and it has done all other things that DNA was required to do under the Policy.

9.     CSS has breached the terms of the Policy to DNA's damage by failing to properly investigate, evaluate, and pay for the loss or damage to the Covered Property.

<u>Count II</u>
(Breach of Contract – Improper Claim Settlement Practices)

10.     DNA repeats the allegations of Paragraphs 1 through 7 of its Counterclaim as if said allegations had been restated herein in their entirety.

11.     At various times up to and including January 2004, DNA stored hundreds of works of fine art that were under its care, custody or control, in Suite 210, of the Tremont Estates Building of the Boston Center for the Arts, Inc. (the "BCA"), located at 551 Tremont Street, Boston, Massachusetts (the "Premises").  The Premises were an insured location under the Policy.

12.     In 2003, while the works of fine art were being stored in the Premises, someone from the BCA entered the Premises without permission or authority, removed the contents of the Premises, and in the process, destroyed, damaged, or lost approximately 1,200 works of fine art, all of which were Covered Property as defined in the Policy.

13.     On or about January 4, 2004, DNA promptly notified CSS of said loss or damage to the Covered Property, and it has done all other things required of it under the terms of the Policy, including but not limited to the following:

a.     notifying the Boston Police Department of the loss;

b.     giving a description to CSS of how, when and where the loss or damaged occurred;

c.     cooperating in the investigation or settlement of the claim;

d.     taking all reasonable steps to protect the Covered Property from further damage, and setting aside the damaged property for examination;

e.      making a written demand for an appraisal and selecting a competent and impartial appraiser to value the amount of the loss;

f.      obtaining an appraisal of the Covered Property and providing a copy of the appraisal to CSS in an amount far in excess of the $2,000,000 Policy limit;

14.     CSS breached the terms of the Policy by retaining an appraiser who did one or more of the following things:

a.      failed to value the Covered Property in accordance with the terms of the Policy;

b.      discounted the value of the Covered Property by using criteria that are not contained in the Policy;

c.      appraised the Covered Property without personally inspecting the damaged works of fine art;

d.      attempted to influence one of the potential third-party umpires who was mutually chosen under the terms of Policy to reconcile the differences in valuation between appraisals of the respective Parties, by making inappropriate comments and suggestions to the third-party umpire.

15.     CSS further breached the terms of the Policy by doing one or more of the following things:

a.      insisting that the value of DNA's claim be discounted under one or more theories none of which are provided for under the terms of the Policy;

b.      rejecting an otherwise qualified and competent third-party umpire who was contacted to reconcile the differences in valuation between the respective

appraisals of the Parties mainly because the prospective third-party umpire would

not apply a particular discount to the value of DNA's appraisal;

c.       failing to represent DNA and/or to compensate DNA for the cost of

litigation including attorney's fees incurred in an action commenced in U.S.

District Court for the District of Massachusetts entitled, Lawrence and DNA

Gallery, LLC v. Boston Center for the Arts, Inc. et al., Civil Action Number 05-

12180 (the "Action").  This Action was commenced in large part to protect the

subrogation rights of CSS under the Policy, which rights would have been barred

by the applicable statute of limitations if the Action had not been filed;

d.       at a court-ordered pretrial settlement conference for the Action, which

CSS voluntarily attended,  CSS insisted on receiving a credit towards its

subrogation claim which was $50,000 more than the BCA and the other defendant

were willing to pay to DNA and the other plaintiff in order to settle the litigation.

16.       CSS has breached the terms of the Policy to DNA's damage by failing to

properly investigate, evaluate, and pay for the loss or damage to the Covered Property.


<u>Count III</u>
<u>(Unfair Insurance Claims Settlement Practices and</u>
<u>Violation of the Massachusetts Consumer Protection Act)</u>

17.       DNA repeats the allegations of Paragraphs 1 through 7 and 10 through 16

of its Counterclaim as if said allegations had been restated herein in their entirety.

18.       The appraiser hired by CSS did not dispute the inventory value of

$3,503,050 submitted by DNA for the artwork that was lost, damaged or destroyed.  The

CSS' appraiser merely applied discounts to the inventory value that were not provided for

in the Policy.  Without these discounts, the value of DNA's claim far exceeds the

$2,000,000 Policy limit of liability.  With the discounts, CSS' appraiser valued the Covered Property at $23,915.

19.    In addition, DNA was required to protect the subrogation rights of CSS under the Policy by instituting a lawsuit (the "Action") against the BCA and the other parties who were responsible for the loss, damage and destruction of the artwork.  If this Action had not been brought when it was, the statute of limitations would have barred the subrogation rights of CSS under the Policy.  CSS delayed the investigation and payment of DNA's claim under the Policy, and when the Action was filed, it never offered to take responsibility for or pay for maintaining and prosecuting the Action.  However, at the court-ordered settlement conference which CSS voluntarily attended in Boston, it insisted that it be given a credit against its subrogation rights which were $50,000 greater than the BCA and the other defendant were willing to pay in settlement to DNA and the other plaintiff.

20.    As a result, CSS committed one or more unfair claim settlement practices which are prohibited under the provisions of Massachusetts General Laws, Chapter 176D, Section 3(9), and in particular the following subsections:

(b)    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d)    Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e)    Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed:

(f)    Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; and

(n)     Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

21.     In committing one or more Unfair Claim Settlement Practices in violation of Massachusetts General Laws Chapter 176D, CSS also committed unfair or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Massachusetts General Laws Chapter 93A, and the rules and regulations of the Attorney General of Massachusetts that were promulgated thereunder, all to DNA's damage.

WHEREFORE, Defendant, Plaintiff in Counterclaim, DNA GALLERY, LLC, demands judgment against the Plaintiff, Defendant in Counterclaim, CONSTITUTION STATE SERVICES, LLC, and its agents, servants, employees, attorneys, or predecessors in interest as follows:

a.)     That this court select and appoint an third-party umpire to determine the value of DNA's claim under the terms of the Policy.

b)     That this Court award DNA damages equal to the value under the Policy of all Covered Property that has been lost, damaged or destroyed;

c)     That this Court award DNA damages in an amount equal to the value of all works of art before they were damaged, or an amount that would permit DNA to repair or restore all damaged works of art, whichever is greater;

d)     That the Court award DNA triple but no less than double its damages, plus costs and attorney's fees under the Massachusetts Consumer Protection Act, Massachusetts General Laws Chapter 93A, for the unfair claims settlement

practices committed by CSS or its agents, servants, employees, attorneys, or

predecessors in interest;

e)     That this Court award DNA its costs together with reasonable attorney's

fees in an amount to be determined by this Court;

f)     That DNA have such other and further relief as is deemed to be just and

proper.

**<u>DNA GALLERY, LLC CLAIMS TRIAL BY JURY</u>**
**<u>ON ALL ISSUES HEREIN TRIABLE BY JURY</u>**

DNA GALLERY, LLC,
By its attorney,

s/ Andrew D. Epstein

March 21, 2008                              Andrew D. Epstein, Esquire
                                            Mass. Bd. of Bar Overseers #155140
                                            Barker, Epstein & Loscocco
                                            10 Winthrop Square
                                            Boston, MA  02110
                                            (617) 482-4900
                                            FAX: (617) 426-5251
                                            Email: PhotoLaw@AOL.com

# Exhibit A

---

## DeWitt Stern Group
## Art, Antiques & Collectibles Dealers
## Insurance Program

---

**This Declaration Page is attached to and forms a part of Policy Conditions.**

---

**THIS IS TO CERTIFY THAT** the undersigned has procured insurance, in accordance with your instructions, as hereinafter described.

---

**Policy No.: 208 30 00 84**

**This Policy is designed to cover Loss or Damage Insurance per the attached Policy form.**

---

**INSURED:**    **DNA Gallery LLC and Volume Gallery Inc.**
                **530 West 24th Street**
                **New York, NY. 10011**

**PERIOD:**     **12 Months at May 1, 2003  12:01 A.M. Local Standard Time**

**GOODS INSURED:** **"Fine Arts"** usual to the conduct of the Insured's business as more
                fully described and defined in the attached Coverage form.

---

**LIMIT OF INSURANCE:**

**A. The most we will pay for loss or damage to Covered Property is the applicable Limit of Insurance shown below.**

1.   $2,000,000    While located at 530 W. 24th Street, New York, NY 10011.

           or      While located at DNA Gallery LLC, 288 Bradford Street, Provincetown, MA 02657.

           or      While located at Tremont Estates Building #210, 551 Tremont Avenue, Boston, MA 02116.

           or      While located at 540 Massasoit Road, Eastham, MA 02651.

2.   $ NIL         For Furniture, Fixtures, Improvements and Betterments and for Electronic Data processing equipment at the location listed in 1. Above.

SMF 60 53 01 03

3.   $   NIL      For Reference Libraries and/or Catalogues at the location listed in 1.
                  Above.

4.   $   NIL      While located within any Bank Vault in the USA/Canada.

5.   $  100,000   While temporarily at any one Unnamed Location or in Transit,
                  Worldwide.

6.  $2,000,000    Aggregate limit any one time.

7.  $1,000,000    For loss or damage by Earthquake or Volcanic Action at any one location
                  and in the aggregate during each separate 12-month period of this policy,
                  but in no event will we pay more than the limit shown above in A.1. or
                  $1,000,000., whichever is less, for loss or damage by earthquake in the
                  state of California.

8.  $1,000,000    For loss or damage by "Flood" at any one location and in the aggregate
                  during each separate 12-month period of this policy, but in no event will
                  we pay more than the limit shown above in A.1. or $1,000,000.,
                  whichever is less, for loss or damage by "Flood" within any Special Food
                  Hazard Zone Designation A or V, or within any sub-designations of such
                  zones A or V, as determined by the Federal Emergency Agency (FEMA).

**B. The most we will pay for loss or damage for a Coverage Extensions is the applicable
Limit of Insurance in the Coverage Extensions section of the Coverage Form.**

**DEDUCTIBLES:**

$ 1,000      In any one occurrence except

$10,000      For Earthquake or Volcanic Action in the state of California; and

$10,000      For "Flood" in FEMA designated 100 year flood prone zones A or
             V and designated sub-zones.

**CONDITIONS:**

Basis of Valuation - Selling Price less 20% or Cost Price plus 30% whichever is the
greater at the time of loss; Items on Consignment to the Insured valued at Consigned
values plus 10%; and as more fully described in the attached policy.

Terrorism Coverage is excluded.

30 days Cancellation Clause and as more fully described in the attached policy.

SMF 60 53 01 03

(If required)  Subject to satisfactory survey of the Insured's premises within 45 days of attachment, and compliance of recommendations, if any, within a timeframe to be agreed by Underwriters.

**PREMIUM:**          **$8,800.00  per 12 month period.**

**INSURED WITH:**    Centennial Insurance Company a member of the Atlantic Mutual Insurance Group

**COVERAGE FORM:**      Art, Antique & Collectibles Dealers / SMF 60 52 01 03

By: _____                          Date:   April 30, 2003
DeWitt Stern Group, Inc.
Fine Arts Department

<u>**FOR INTERNAL CODING PURPOSES:**</u>
| | |
|---|---|
| **SBU:** | Marine, Line 3 |
| **Prod.:** | 001-6801, 2500 |
| **Deductible:** | 07 |
| **ISO:** | 332 |
| **Direct Bill:** | 863 |

SMF 60 53 01 03

# UNDERWRITING INFORMATION:

**CLIENT SINCE:**    2003
**SURVEYS:**
**LOSS EXPERIENCE:**    No Losses

| Year | Net Premium | Claims Paid | Outstanding | Ratio |
|------|-------------|-------------|-------------|-------|

Note:

**NUMBER OF SHOWS:**    TBD    USA/Canada    0    Worldwide

## DETAILS OF SECURITY/ALARM:
530 W. 24th St.: Central station fire/burglar alarms, smoke detectors, fire extinguisher, motion detectors, window/door contacts.
288 Bradford St.: Central Station Alarm under review by the landlord, Fire extinguishers, Smoke detectors.
551 Tremont St.: Central station fire alarm, sprinklers, fire extinguisher, smoke detectors.
540 Massasoit Rd.: Central station fire and burglar alarms, smoke detectors, flood central, heat, window/door contacts.

## DETAILS OF CONSTRUCTIONS:
530 W. 24th St.: Masonry, built 2003, multiple tenancy, leased, commercial building. ½ from fire dept., 50 ft. from hydrant.
288 Bradford St.: Frame, built 1900, multiple tenancy, leased, commercial building.
551 Tremont St.: Brick, built 1850, renovated 1975. Occupies 2nd floor, 450 sq. ft. ½ mile from fire dept., 50 ft. from hydrant, 1 mile from nearest body of water.
540 Massasoit Rd.: Frame, year built 1802, renovated 1985, located 2 mi. from fire dept., 1 mile from nearest body of water.

## ANY OTHER RELEVANT INFORMATION:
DNA: Stock consists of paintings, sculptures, photography —contemporary.
Volume: Antiquarian & contemporary rare books.
DNA: Estimated annual sales are $350,000-$500,000
Volume: Estimated annual sales are $400,000-$500,000
Record keeping consists of computer database, backed up weekly.
No coverage canceled, declined or non-renewed during prior three years.
Of the total area of __', only __' is open to the public.

## RATING:

| Section | Limit | Rate | Premium |
|---------|-------|------|---------|
| Premises | $2,000,000 | .38% | $7,600.00 |
| Transit | $ 100,000 | 1.1% | $1,100.00 |
| | | Subtotal: | $8,700.00 |
| | | Debit: | $ 100.00 |
| | | **Total:** | **$8,800.00** |

SMF 60 53 01 03

# DeWitt Stern Group
# Art, Antique and Collectibles Dealers
## Coverage Form

Various provisions In this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and what is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to the DEFINITIONS section in this Coverage Form.

## A. COVERAGE

We will pay for loss of or damage to Covered Property from any of the Covered Causes of Loss.

### 1. COVERED PROPERTY

Covered Property, as used in this coverage form, means "fine arts" which is:

a. Your stock held for sale, including your interest in property jointly owned with others;

b. Property of others which is in your care, custody or control and which, prior to loss or damage, you have been instructed to insure;

c. Property for which payment is being made in installments while such property is located at the buyer's location including transit between your location and the buyers location except where title to the property has passed to the buyer, subject to such property being included in your inventory until title passes from you to the buyer;

d. Your reference library and other reference material you own, if a limit is shown on the declarations page;

e. Furniture, fixtures, improvements and betterments belonging to you, and;

f. "Hardware" and "data/media" belonging to you, if a limit is shown on the declarations page.

### 2. LEGAL LIABILITY

We will cover your legal liability as a bailee for "fine arts" of others in your care, custody or control which you have been instructed not to insure. The most we will pay in any one occurrence for defense costs and any judgments is the Limit of Insurance shown on the Declarations page in clause A.1.

### 3. PROPERTY NOT COVERED

Covered Property does not include:

a. Shipments by mail except registered first class or certified mail;

b. Contraband or property in the course of illegal transportation or trade; or

c. Land (including land on which the property is located) or water.

### 4. COVERED CAUSES OF LOSS

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS to Covered Property except those causes of loss listed in the Exclusions.

### 5. COVERAGE EXTENSIONS

a. **Debris Removal**

(1) We will pay your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause Of Loss that occurs during the policy period.

The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) The most we will pay under this Coverage Extension is 25% of:

   (a) The amount we pay for the direct physical loss or damage to Covered Property; plus

   (b) The deductible in this policy applicable to that loss or damage.

(3) Payment under this Coverage Extension will not increase the applicable Limit Of Insurance, but if:

   (a) The sum of direct physical loss or damage and debris removal expense exceeds the Limit Of Insurance; or

   (b) The debris removal expense exceeds the amount payable under the 25% limitation;

   We will pay up to an additional $5,000 in any one occurrence under this Coverage Extension.

(4) This Coverage Extension does not apply to costs to:

   (a) Extract "pollutants" from land or water; or

   (b) Remove, restore or replace polluted land or water.

**b. Pollutant Clean-Up And Removal**

We will pay your expenses to extract "pollutants" from land or water at the premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause Of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause Of Loss occurs.

This Coverage Extension does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants."

But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Coverage Extension is $10,000 for the sum of all such expenses including testing and legal expenses arising out of Covered Causes Of Loss occurring during each separate 12-month period of this policy.

**c. Expediting Expenses**

We will pay your actual and reasonable costs resulting from a covered loss or damage to Covered Property to expedite repair or replacement including, but not limited to, overtime, night work, work on public holidays, rapid transportation of people and/or materials, and extra costs of temporary repair.

This Coverage Extension will apply from the date of the covered loss or damage and for such time reasonably necessary to repair, replace, or rebuild the Covered Property.

The most we will pay for loss or damage under this Coverage Extension is $1,000

**d. Inventory, Appraisals, and Loss Adjustment Expenses**

We will pay the reasonable expenses you incur at our request to assist us in determination of the amount of the covered loss, including the extra wages necessarily incurred by your employees for preparing inventories and other loss information for completion of your proof of loss.

But we will not pay for:

(1) Expenses to prove that the loss or damage is covered;

SMF 60 52 01 03

**(2)** Expenses incurred under the Appraisal section of the Commercial Inland Marine Conditions;

**(3)** Expenses incurred for examinations under oath, even if required by us; or

**(4)** Expenses incurred for public adjusters or any legal fees.

The most we will pay for loss or damage under this Coverage Extension is $1,000.

**e.  Fire Department Service Charges**

We will pay your expense for fire department service charges when the fire department is called to save or protect Covered Property from a Covered Cause of Loss.

The most we will pay for loss or damage under this Coverage Extension is $2,500.

The policy deductible will not apply to this Coverage Extension.

**f.  Refilling of Fire Protection Devices**

We will pay your actual costs to refill fire protection devices which are discharged as a result of a Covered Cause of Loss.

The most we will pay for loss or damage under this Coverage Extension is $2,500.

**g.  USPS Shipments**

We will pay your actual loss sustained for Covered Property in transit via the United States Postal Service (USPS), other than first class or registered mail, from a Covered Cause of Loss.

The most we will pay for loss or damage under this Coverage Extension is $2,500 per package and $10,000 during the term of this policy.

**h.  Damage to Buildings as a Result of Theft**

We will pay your actual and reasonable costs to repair damage caused by theft or attempted theft to that part of any building containing Covered Property; or equipment within the building used to maintain or service the building, but only if you own the building or are legally responsible for the damage.

The most we will pay for loss or damage under this Coverage Extension is the lesser of $10,000 or 10% of the applicable Limit of Insurance stated in the Declarationpage.

**i.  Damage to Packing Cases and Show Cases**

We will pay your actual and reasonable costs to repair damage caused by a Covered Cause of Loss to Packing Cases and Show Cases.

The most we will pay for loss or damage under this Coverage Extension is $5,000.

**j.  Damage to Valuable Papers and Records**

We will pay your actual and reasonable costs to repair damage caused by a Covered Cause of Loss to Valuable Papers and Records which are not for sale; are used for the conduct of your business; and are located specifically in the part of your premises your occupy for your business.

The most we will pay for loss or damage under this Coverage Extension is $5,000.

**k.  Damage to Accounts Receivable**

We will pay your actual loss sustained for your Accounts Receivable balances owed you which are used for the conduct of your business, and are located specifically in the part of your premises your occupy for your business from a Covered Cause of Loss.

The most we will pay for loss or damage under this Coverage Extension is the lesser of $10,000 or 10% of the applicable Limit of Insurance stated in the Declaration Page as determined below:

1.  Sums owed you by customers which you cannot collect;
2.  Interest charges you must pay on loans obtained to offset impaired collections;
3.  That part of your collection costs that exceed your normal costs; and
4.  Other costs you reasonably incur to restore your records..

**I.  Money in Locked Safes or Vaults**

We will pay your actual loss sustained for money used for the conduct of your business but only while located in your locked safe or vault at the premises specified in the Declarations page and only for loss or damage caused by theft or attempted theft where there are visible signs that the theft was a result of forced entry.

The most we will pay for loss or damage under this Coverage Extension is $1,000.

## B.  EXCLUSIONS

1.  We will not pay for a loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.

   **a.  Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

   **b.  Nuclear Hazard**

   (1)  Any weapon employing atomic fission or fusion; or

   (2)  Nuclear reaction or radiation or radioactive contamination from any other cause. But we will pay for direct loss or damage caused by resulting fire if the fire would be covered under this Coverage Form.

   **c.  War And Military Action**

   (1)  War, including undeclared or civil war;

   (2)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3)  Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

   **d.  "Flood"**

   But we will pay for loss or damage by resulting fire or explosion.

   This exclusion does not apply to property in transit or if a Limit of Insurance is shown for "flood" in this Coverage Form Declarations.

   **e.  Earthquake or Volcanic Action**

   But we will pay for loss or damage by resulting fire or explosion.

   All earthquake shocks that occur within any 168-hour period will constitute a single earthquake.

   This exclusion does not apply to property in transit or if a Limit of Insurance is shown for Earthquake or Volcanic Action in this Coverage Form Declarations..

2.  We will not pay for loss or damage caused by or resulting from any of the following:

   **a.**  Delay, loss of use, loss of market or any other consequential loss.

   **b.**  Dishonest or criminal acts committed by:

SMF 60 52 01 03

(1) You, any of your partners, employees, directors, trustees, or authorized representatives;

(2) A manager or a member if you are a limited liability company;

(3) Anyone else with an interest in the property or their employees or authorized representatives; or

(4) Anyone else to whom the property is entrusted for any purpose.

This exclusion applies whether or not such persons are acting alone or in collusion with other persons or such acts occur during the hours of employment.

But this exclusion does not apply to Covered Property that is entrusted to others who are carriers for hire or acts of destruction by your employees.

But theft by employees is not covered.

   **c.** Any willful act intended to cause loss or damage committed by you or anyone else at your direction.

   **d.** Unexplained disappearance.

   **e.** Shortage found upon taking inventory.

   **f.** Theft from an unattended vehicle unless at the time of the theft its windows, doors and compartments were closed and locked, and there are visible signs that the theft was a result of forced entry, excepting carriers for hire.

   **g.** Any repairing, restoration or retouching of covered property.

   **h.** Financial default or default in payment to you, which includes the dishonor or other default in connection with checks or other instruments of payment accepted by you in good faith, insolvency of any kind (including administration and receivership), judicial and quasi-judicial seizure or distrainment or forfeiture (including wrongful seizure or distrainment or forfeiture) or any default whatsoever in payment.

**3.** We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause Of Loss results, we will pay for that resulting loss or damage.

   **a.** Wear and tear, gradual deterioration, any quality in the property that causes it to damage or destroy itself, hidden or latent defect.

   **b.** Fading; creasing, denting, scratching or tearing; thinning; color transfer; dampness; or temperature extremes.

   **c.** Insects, birds, rodents or other animals.

   **d.** Bacteria, fungus or mold.

   **e.** An error or omission in programming or instructions to the "hardware".

## C. LIMITS OF INSURANCE

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in this Coverage Form Declarations.

## D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss exceeds the Deductible shown in this Coverage Form Declarations.

We will then pay the amount of the adjusted loss in excess of the Deductible, up to the applicable Limit of Insurance.

## E. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Commercial Inland Marine Conditions and Common Policy Conditions:

### 1. COVERED TERRITORY

We will cover property wherever located within the World, except where prohibited by law.

### 2. VALUATION

The valuation condition contained in the Commercial Inland Marine Conditions is deleted and replaced by the following:

In the event of loss or damage, the value of Covered Property which is:

(a) Covered Property you own will be the that valuation as noted in the Declarations Page.

(b) Covered Property which has been sold but not delivered will be selling price plus actual incurred expenses incurred.

(c) Covered Property of others held by you on consignment or entrusted to you will be the consigned or entrusted value plus 10%.

(d) Covered Property of others or Covered Property owned on joint account held by you will be the amount agreed upon, prior to loss or damage, by you and the lender or joint owner, otherwise we will not be liable beyond the Actual Cash Value of that Property.

(e) Covered Property as described in clause A. 2, 3 and 4. will be the Replacement Cost Value of that Property, except "media/data" will be the actual cost of reproduction or replacement unless it is not replaced or reproduced, when we will not pay more than the cost of the blank value of the "media".

In the event of loss or damage, the value of the property will be determined as of the time of loss or damage.

### 3. PAIR AND SETS

The Pair and Sets condition contained in the Commercial Inland Marine Conditions is deleted and replaced by the following:

In case of loss or damage to more than one article which is part of a pair or set we will pay you, if you choose, the value, as established in the Valuation clause of this Coverage form, of the pair of set. If you choose this option, you will give us whatever remains of the pair or set.

Otherwise, we will either:

(a) Repair of replace any part to restore the pair of set to its value before the loss, or

(b) Pay the difference between the value of the pair or set before and after the loss,

However, in no event will we pay more than the applicable Limit of Insurance shown in the Declarations page.

### 4. IMPAIRMENT OF RECOVERY RIGHTS

If by any act or agreement after loss or damage you impair our right to recover from others liable for the loss or damage, we will not pay you for that loss or damage.

### 5. PACKING AND SHIPPING

You agree that Covered Property will be packed and unpacked by competent packers.

### 6. ALARM MAINTENANCE

You agree that Covered Property will be protected by the Alarm system (if any) installed and maintained at your premises during the course of this policy term.

### 7. SHOWS AND EXHIBITIONS

You agree that Covered Property, while located at shows and exhibitions, will be located within a fully locked room(s) which are alarmed and guarded as declared on your application during any time other than standard opening hours. You further agree that Covered Property while displayed will be attended at all times.

8. **RECORDS**

You agree to keep detailed and itemized inventory of all Covered Property.

9. **NOTICE OF LOSS**

In the event of loss or damage to Covered Property, you are required, as soon as practicable, to report in writing to us or DeWitt Stern Group, Inc., 420 Lexington Avenue, Suite 2720, New York, NY 10170 every event which may give rise to a claim under this insurance. You must also file, if we request, within ninety (90) days from date of discovery of such loss or damage, a detailed proof of loss.

10. **REWARDS**

In the event of covered loss or damage which, in our opinion, is of sufficient amount to warrant such action, we may advertise a reward. This reward may be advertised in your name or your name and ours, and would be available for information which would lead to the arrest and conviction of the person(s) causing the loss and/or the return of stolen property.

Whether such a reward is offered and the amount of such reward will be solely at our discretion but will not affect your Limits of Insurance in any way.

You may, at your option, add to the amount of the reward we offer or offer a reward yourself if we decide not to offer one. But we will not reimburse you for such reward or for any related expense.

11. **BUY BACK AGREEMENT**

If we recover property for which we have already paid you, you have the right to buy the property back from us. You will pay an amount equal to the current market value of the recovered property but not more than what we paid you, plus an amount for loss adjustment and recovery expenses.

We will make every effort to notify you of your right to buy back damaged or recovered property. You will have 60 days from the time you receive our notice to repurchase the property.

12. **NO CLAIMS BONUS, IF POLICY RENEWED**

In the event no claims for loss or damage are incurred under this policy and the prior two policy terms, not less than 36 months, we agree to apply a credit equal to 5% of the annual premium paid under this policy, to the renewal premium of this policy.

## F. DEFINITIONS

1. "Fine Arts" means paintings, etchings, drawings (including frames, glasses and shadow boxes; rare books, manuscripts, rugs, tapestries, sculptures, statuary and other bona fide works of art, rarity, historic value or artistic merit.

2. "Flood" means waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.

3. "Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

4. "Hardware" means a network of machine components capable of accepting information or converting material, processing it according to a plan or program; and producing the desired results

5. "Data/media" means the facts, concepts, instructions, software or programs converted to a form usable by the "hardware" and includes the disks, compact disks, disk packs, storage modules or other "hardware" usable materials on which these items are stored.

SMF 60 52 01 03

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the loss or damage. Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the loss or damage occurred.

4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

   Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8. Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10. Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

    Copyright, Insurance Services Office, Inc., 1999

## E. Loss Payment

1. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

2. We will not pay you more than your financial interest in the Covered Property.

3. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

4. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

5. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

   a. We have reached agreement with you on the amount of the loss; or

   b. An appraisal award has been made.

6. We will not be liable for any part of a loss that has been paid or made good by others.

## F. Other Insurance

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## G. Pair, Sets Or Parts

1. **Pair Or Set**

   In case of loss or damage to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the loss or damage; or

   b. Pay the difference between the value of the pair or set before and after the loss or damage.

2. **Parts**

   In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

## H. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

## I. Reinstatement Of Limit After Loss

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

## J. Transfer Of Rights Of Recovery Against Others To Us

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property.

2. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

   a. Someone insured by this insurance; or

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you.

This will not restrict your insurance.

Copyright, Insurance Services Office, Inc., 1999

CM 00 01 09 00

## GENERAL CONDITIONS

### A. Concealment, Misrepresentation Or Fraud

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

### B. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### C. Legal Action Against Us

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and
2. The action is brought within 2 years after you first have knowledge of the direct loss or damage.

### D. No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### E. Policy Period

We cover loss or damage commencing:

1. During the policy period shown in the Declarations; and
2. Within the coverage territory.

### F. Valuation

The value of property will be the least of the following amounts:

1. The actual cash value of that property;
2. The cost of reasonably restoring that property to its condition immediately before loss or damage; or
3. The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98              Copyright, Insurance Services Office, Inc., 1998              Page 1 of 1

IL 09 73 11 02

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL CRIME COVERAGE FORM
> COMMERCIAL CRIME POLICY
> COMMERCIAL INLAND MARINE
> EMPLOYEE THEFT AND FORGERY POLICY
> GOVERNMENT CRIME COVERAGE FORM
> GOVERNMENT CRIME POLICY
> KIDNAP/RANSOM AND EXTORTION COVERAGE FORM
> KIDNAP/RANSOM AND EXTORTION POLICY

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

**1.** The act resulted in aggregate losses in excess of $5 million; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The following exclusion is added:

**CERTIFIED ACT OF TERRORISM EXCLUSION**

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL AUTO COVERAGE PART
> COMMERCIAL CRIME COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EMPLOYMENT – RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

A. For policies with fixed terms in excess of one year, or policies with no stated expiration date, except as provided in paragraph B., the following applies:

The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal or continuation of this policy, we will compute the premium in accordance with our rates and rules then in effect.

B. For policies with fixed terms in excess of one year, where premium is computed and paid annually, the following applies:

1. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. Such rates and rules will be used to calculate the premium at each anniversary, for the entire term of the policy, unless the specific reasons described in Paragraph 2. or 3. apply.

2. The premium will be computed based on the rates and rules in effect on the anniversary date of the policy only when, subsequent to the inception of the current policy period, one or more of the following occurs:

   a. After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period.

   b. A material physical change in the property insured, occurring after issuance or last anniversary renewal date of the policy, causes the property to become uninsurable in accordance with underwriting standards in effect at the time the policy was issued or last renewed; or

   c. A material change in the nature or extent of the risk, occurring after issuance or last anniversary renewal date of the policy, which causes the risk of "loss" to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed.

3. If, subsequent to the inception of the current policy period, the Limit of Insurance is increased, or Additional Coverages or Causes of Loss are insured, the rates and rules in effect at the time of the change will be applied to calculate the premium and will continue to apply to the change at subsequent anniversary dates.

IL 01 85 04 98        Copyright, Insurance Services Office, Inc., 1997

INTERLINE

IL 02 68 07 00

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW YORK CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs 1., 2., 3. and 5. of the **Cancellation** Common Policy Condition are replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this entire policy by mailing or delivering to us advance written notice of cancellation.

2. **Cancellation Of Policies In Effect**

   a. **60 Days Or Less**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1) 30 days before the effective date of cancellation if we cancel for any reason not included in Paragraph A.2.a.(2) below.

   (2) 15 days before the effective date of cancellation if we cancel for any of the following reasons:

      (a) Nonpayment of premium;

      (b) Conviction of a crime arising out of acts increasing the hazard insured against;

      (c) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim;

      (d) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and that occurred subsequent to inception of the current policy period;

(e) Material physical change in the property insured, occurring after issuance or last annual renewal anniversary date of the policy, that results in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last renewed; or material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

(f) Required pursuant to a determination by the Superintendent that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public;

(g) A determination by the Superintendent that the continuation of the policy would violate, or would place us in violation of, any provision of the Insurance Code; or

   Copyright, Insurance Services Office, Inc., 1999

**(h)** Where we have reason to believe, in good faith and with sufficient cause, that there is a probable risk of danger that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. If we cancel for this reason, you may make a written request to the Insurance Department, within 10 days of receipt of this notice, to review our cancellation decision. Also, we will simultaneously send a copy of this cancellation notice to the Insurance Department.

**b. For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy we issued, we may cancel only for any of the reasons listed in Paragraph A.2.a.(2) above, provided we mail the first Named Insured written notice at least 15 days before the effective date of cancellation.

3. We will mail or deliver our notice, including the reason for cancellation, to the first Named Insured at the address shown in the policy and to the authorized agent or broker.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, we will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

7. If one of the reasons for cancellation in Paragraphs **A.2.a.(2)** or **D.2.b.(2)** exists, we may cancel this entire policy, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this policy.

**C.** The following Conditions are added:

**1. Nonrenewal**

If we decide not to renew this policy we will send notice as provided in Paragraph **C.3.** below.

**2. Conditional Renewal**

If we conditionally renew this policy subject to a:

a. Change of limits;

b. Change in type of coverage;

c. Reduction of coverage;

d. Increased deductible;

e. Addition of exclusion; or

f. Increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

we will send notice as provided in Paragraph **C.3.** below.

**3. Notices Of Nonrenewal And Conditional Renewal**

a. If we decide not to renew this policy or to conditionally renew this policy as provided in Paragraphs **C.1.** and **C.2.** above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least 60 but not more than 120 days before:

(1) The expiration date; or

(2) The anniversary date if this is a continuous policy.

b. Notice will be mailed or delivered to the first Named Insured at the address shown in the policy and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

c. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

d. If we violate any of the provisions of Paragraphs **C.3.a.**, **b.** or **c.** above by sending the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice:

(1) Coverage will remain in effect at the same terms and conditions of this policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the first Named Insured, during this 60 day period, has replaced the coverage or elects to cancel.

Copyright, Insurance Services Office, Inc., 1999

IL 02 68 07 00    □

(2) On or after the expiration date of this policy, coverage will remain in effect at the same terms and conditions of this policy for another policy period, at the lower of the current rates or the prior period's rates, unless the first Named Insured, during this additional policy period, has replaced the coverage or elects to cancel.

e. We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

D. The following provisions apply when the Commercial Property Coverage Part or the Farm Coverage Part is made a part of this policy:

1. Items D.2. and D.3. apply if this policy meets the following conditions:

   a. The policy is issued or issued for delivery in New York State covering property located in this state; and

   b. The policy insures:

      (1) For loss of or damage to structures, other than hotels or motels, used predominantly for residential purposes and consisting of no more than four dwelling units; or

      (2) For loss of or damage to personal property other than farm personal property or business property; or

      (3) Against damages arising from liability for loss of, damage to or injury to persons or property, except liability arising from business or farming; and

   c. The portion of the annual premium attributable to the property and contingencies described in 1.b. exceeds the portion applicable to other property and contingencies.

2. Paragraph 2. of the Cancellation Common Policy Condition is replaced by the following:

   **2. Procedure And Reasons For Cancellation**

   a. We may cancel this entire policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      (1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   b. But if this policy:

      (1) Has been in effect for more than 60 days; or

      (2) Is a renewal of a policy we issued:

   we may cancel this policy only for one or more of the following reasons:

      (1) Nonpayment of premium;

      (2) Conviction of a crime arising out of acts increasing the risk of loss;

      (3) Discovery of fraud or material misrepresentation in obtaining the policy or in making a claim;

      (4) Discovery of willful or reckless acts or omissions increasing the risk of loss;

      (5) Physical changes in the covered property that make that property uninsurable in accordance with our objective and uniformly applied underwriting standards in effect when we:

         (a) Issued the policy; or

         (b) Last voluntarily renewed the policy;

      (6) The Superintendent of Insurance's determination that continuing the policy would violate Chapter 28 of the Insurance Law; or

      (7) Required pursuant to a determination by the Superintendent of Insurance that the continuation of our present premium volume would be hazardous to the interests of our policyholders, our creditors or the public.

3. The following are added:

   a. **Conditional Continuation**

   Instead of cancelling this policy, we may continue it on the condition that:

      (1) The policy limits be changed; or

      (2) Any coverage not required by law be eliminated.

   If this policy is conditionally continued, we will mail or deliver to the first Named Insured written notice at least 20 days before the effective date of the change or elimination. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

b. **Nonrenewal**

If, as allowed by the laws of New York State, we:

(1) Do not renew this policy; or

(2) Condition policy renewal upon:

(a) Change of limits; or

(b) Elimination of coverage;

we will mail or deliver written notice of nonrenewal or conditional renewal:

(a) At least 45 days; but

(b) Not more than 60 days;

before the expiration date of the policy. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

E. The following is added to the Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions and the Commercial Property Coverage Part:

When the property is subject to the Anti-Arson Application in accordance with New York Insurance Department Regulation No. 96, the following provisions are added:

If you fail to return the completed, signed and affirmed anti-arson application to us:

1. Or our broker or agent within 45 days of the effective date of a new policy, we will cancel the entire policy by giving 20 days' written notice to you and to the mortgageholder shown in the Declarations.

2. Before the expiration date of any policy, we will cancel the policy by giving written notice to you and to the mortgageholder shown in the Declarations at least 15 days before the effective date of cancellation.

The cancellation provisions set forth in E.1. and E.2. above supersede any contrary provisions in this policy including this endorsement.

If the notice in E.1. or E.2. above is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

F. The following applies to the Commercial Property Coverage Part and the Farm Coverage Part:

Paragraphs f. and g. of the **Mortgageholders** Condition are replaced by the following:

f. **Cancellation**

(1) If we cancel this policy, we will give written notice to the mortgageholder at least:

(a) 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

(2) If you cancel this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, cancellation will become effective on the later of:

(a) The effective date of cancellation of the insured's coverage; or

(b) 10 days after we give notice to the mortgageholder.

g. **Nonrenewal**

(1) If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

(2) If you elect not to renew this policy, we will give written notice to the mortgageholder. With respect to the mortgageholder's interest only, nonrenewal will become effective on the later of:

(a) The expiration date of the policy; or

(b) 10 days after we give notice to the mortgageholder.

    Copyright, Insurance Services Office, Inc., 1999    IL 02 68 07 00    □

G. The following provisions apply when the following are made a part of this policy:
   Commercial General Liability Coverage Part
   Farm Liability Coverage Form
   Liquor Liability Coverage Part
   Products/Completed Operations Liability Coverage Part

1. The aggregate limits of this policy as shown in the Declarations will be increased in proportion to any policy extension provided in accordance with Paragraph **C.3.d.** above.

2. The last sentence of Limits Of Insurance does not apply when the policy period is extended because we sent the first Named Insured an incomplete or late conditional renewal notice or a late nonrenewal notice.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES – FRAUD

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART – FARM PROPERTY – OTHER FARM PROVISIONS FORM –
    ADDITIONAL COVERAGES, CONDITIONS, DEFINITIONS
FARM COVERAGE PART – MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
FARM COVERAGE PART – LIVESTOCK COVERAGE FORM

The CONCEALMENT, MISREPRESENTATION OR FRAUD condition is replaced by the following:

**FRAUD**

We do not provide coverage for any insured ("insured") who has made fraudulent statements or en-gaged in fraudulent conduct in connection with any loss ("loss") or damage for which coverage is sought under this policy.

However, with respect to insurance provided under the COMMERCIAL AUTOMOBILE COVERAGE PART, we will provide coverage to such "insured" for damages sustained by any person who has not made fraudulent statements or engaged in fraudulent conduct if such damages are otherwise covered under the policy.

IL 01 83 04 98            Copyright, Insurance Services Office, Inc., 1997            Page 1 of 1